

# In the Missouri Court of Appeals
# Eastern District

## DIVISION ONE

| | | |
|---|---|---|
| CAR WASH SPECIALTIES, LLC, | ) | No. ED102075 |
| | ) | |
| Plaintiff/Appellant, | ) | Appeal from the Circuit Court of |
| | ) | Lincoln County |
| vs. | ) | |
| | ) | Honorable Chris K. Mennemeyer |
| HAROLD L. TURNBULL AND | ) | |
| ELSIE W. TURNBULL, | ) | |
| | ) | Filed: June 2, 2015 |
| Defendants/Respondents. | ) | |

### INTRODUCTION

Car Wash Specialties, LLC ("CWS") appeals the judgment of the trial court granting summary judgment in favor of Harold and Elsie Turnbull ("Landlords'") on CWS's petition for declaratory judgment regarding the extension of a lease agreement. CWS contends the trial court erred in interpreting the terms of the lease agreement, because it: (1) determined as a matter of law that the lease required CWS to notify Landlords that it intended to extend the lease term another five years; (2) failed to consider parol evidence and construe allegedly ambiguous language in the lease against Landlords; and (3) interpreted the lease to require CWS to forfeit a $200,000 payment owed to it by Landlords. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The undisputed facts are that CWS, by virtue of an assignment (the "Assignment") of a prior commercial lease (the "Lease"), entered into an agreement with Landlords to lease a tract

of land for a term of five years, for the purpose of conducting business as a carwash. The term of the assigned Lease ran from December 1997 to December 2002.[1] The Lease, however, provided CWS with an option to renew "for four (4) consecutive additional terms of five (5) years each . . ." if CWS notified Landlords in writing at least 90 days before the end of each term that it intended to renew the Lease. Upon renewal, the monthly rental rate would increase as follows:

> "[1] Initial five year term . . . $670.00[,] [2] First renewal term beginning December 2002 . . . $737.00[,] [3] Second renewal term beginning December 2007 . . . $811.00[,] [4] Third renewal term beginning December 2012 . . . $892.00[,] [5] Fourth renewal term beginning December 2017 . . . $985.00 . . . ."

CWS timely renewed the Lease for the "First Renewal Term," running from December 2002 to December 2007. CWS also timely renewed the Lease for the "Second Renewal Term," running from December 2007 to December 2012.

Before the "Second Renewal Term" began, however, a dispute arose between the parties over access to the leased premises, culminating in litigation. In 2009, the parties resolved this prior dispute by entering into a written settlement agreement (the "Settlement").[2] The Settlement provided, in relevant part:

> 1. Within 30 days [Landlords] will pay [CWS] $201,000.00.
>
> 2. [CWS] will immediately agree to a change in access to their property . . . .
>
> 3. [CWS] will continue to pay rent to [Landlords] until such time [CWS] are [sic] notified that [Landlords] have entered into a contract with a third party to develop the carwash tract with [Landlords]' surrounding ground south of Jason Drive and west of Turnbull Trail. At such time [Landlords] will pay to [CWS] the sum of $200,000.00 and [CWS] will remove their fixtures, both within 60 days.

---

[1] Although the Assignment is undated, its provisions indicate it was entered into before the Lease's original term ended in December 2002.

[2] In the prior dispute over access to the property, the trial court originally found in favor of Landlords on their action for declaratory judgment and against CWS on its counterclaim for breach of contract. This Court reversed that judgment in Turnbull v. Car Wash Specialties, LLC, 272 S.W.3d 871 (Mo. App. E.D. 2008), and remanded for a new trial. 272 S.W.3d at 876. Following remand, the parties entered into the Settlement.

4. Until such time the carwash is closed to [sic] the terms as outlined above, [CWS] will continue to pay rent and the parties will perform according to the lease and any assignment or amendments thereto.

. . . .

7. Upon closing and payment of the final $200,000, taxes on the property would be prorated as of the date of that payment.

After settling its dispute with Landlords, CWS continued its tenancy for the "Second Renewal Term." In December 2012, the "Second Renewal Term" ended and CWS failed to notify Landlords that it intended to extend the Lease for the "Third Renewal Term." Nevertheless, CWS remained in possession of the premises and continued to pay rent at the "Second Renewal Term" rate of $811.00 per month.

In May 2013, Landlords demanded by letter that CWS surrender the premises on or before July 1, 2013. Landlords claimed that because CWS failed to notify them of its intent to renew the Lease for the "Third Renewal Term," the Lease expired in December 2012, and CWS remained as a holdover tenant. CWS responded by filing the instant action seeking declaratory judgment.

In its petition, CWS requested the trial court declare it was not obligated to notify Landlords of its intent to renew for the "Third Renewal Term," because the Settlement terms "superseded" the Lease's notification and renewal requirements. In support of its position, CWS pointed to language in the Settlement providing that CWS "will continue to pay rent to [Landlords] until . . . notified that [Landlords] have entered into a contract with a third party to develop the carwash tract . . . [a]t such time [Landlords] will pay to [CWS] the sum of $200,000.00 . . . ." CWS argued this language indefinitely extended the term of the Lease,

3

providing it with a right to lease the premises until Landlords entered into a contract to develop the land and paid CWS $200,000.[3]

Landlords answered and filed a counterclaim seeking declaratory judgment. Landlords also moved for summary judgment, claiming the plain language of the Lease required CWS to notify Landlords of its intent to renew the Lease, and the Settlement did not alter or nullify this obligation. In support, Landlords point to paragraph four of the Settlement, which states that CWS "will continue to pay rent and the parties will perform according to the Lease and any assignment or amendments thereto."

CWS opposed Landlords' motion for summary judgment, arguing the Settlement and the Lease, read together, are ambiguous and the court should consider parol evidence to determine the parties' intent. In support, CWS attached an affidavit from its principal member, Gregory Strawhun, stating the parties intended the Settlement to amend the Lease by creating a lease term that would continue, "until such time as [Landlords] found a developer, paid [CWS] the balance of the damages incurred, and gave [CWS] sixty (60) days' notice in which to remove the car wash equipment and fixtures."

The trial court held a hearing on Landlords' motion for summary judgment. The court considered the parties' arguments, the language of the Lease and Settlement, and supporting exhibits. The court then granted Landlords' motion for summary judgment. The court concluded the Settlement "specifies the parties will perform according to the lease . . ." and this language "negate[s] [CWS]'s argument that the . . . settlement removes the necessity for [CWS] . . . to

---

[3] CWS further argued the Settlement language required Landlords to unconditionally pay CWS $200,000. Alternatively, CWS requested that the court declare that the Settlement language satisfied the written notification requirements for all additional periods, because it informed Landlords in writing of CWS's intent "to extend the lease-term until such time as the [Landlords] obtained a developer and paid the plaintiff the sum of $200,000." CWS also alleged that Landlords "obtained an agreement with a developer concerning the subject property, and have deliberately failed to notify the plaintiff of it, or have, in violation of the spirit and intent of the agreement, intentionally concealed the agreement . . . ."

4

follow the terms of such lease." The court found CWS failed to notify Landlords of its intent to renew the Lease and thereby "allowed said lease to terminate by its own terms."

CWS filed a motion to amend, correct or clarify the court's order. Following a hearing, the court entered final judgment, granting Landlords' motion for summary judgment. The court reiterated that CWS's failure to renew the Lease for an additional five-year term "resulted in the lease terminating by its own terms . . . relieving [Landlords] of any further obligation under the [Lease] . . . ." The court also found that Landlords "did nothing affirmatively or otherwise to violate or breach the terms of the [Lease]" and ordered CWS to remove its fixtures from the premises within 30 days. CWS now appeals.

STANDARD OF REVIEW

"The propriety of summary judgment is purely an issue of law." ITT Commercial Fin. Corp. v. Mid-America Marine Supply Corp., 854 S.W.2d 371, 376 (Mo. banc 1993). Therefore, our review is essentially de novo. Id. Because the trial court's judgment is based on the record submitted and the law, we need not defer to the court's order granting summary judgment. Id. We keep in mind that summary judgment is "an extreme and drastic remedy" and great care should be exercised in utilizing the procedure. Intermed Ins. Co. v. Hill, 367 S.W.3d 84, 88 (Mo. App. S.D. 2012). We therefore view the record in the light most favorable to the party against whom judgment was entered and afford the non-movant the benefit of all reasonable inferences from the record. ITT Commercial Fin. Corp., 854 S.W.2d at 376. Furthermore, we review the trial court's interpretation of a lease de novo. Campus Lodge of Columbia, Ltd. v. Jacobson, 319 S.W.3d 549, 552 (Mo. App. W.D. 2010).

DISCUSSION

In CWS's first two points, it contends the trial court erred in interpreting the terms of the lease agreement, because it: (1) determined as a matter of law that the Lease, together with the Settlement, required CWS to provide notice of its intent to renew the Lease to extend the term another five years; and (2) failed to consider parol evidence to resolve allegedly ambiguous language against Landlords. Both arguments challenge the trial court's grant of summary judgment based on its interpretation of the language of the Lease, together with the Settlement. When construction of a contract is at issue, summary judgment is only appropriate if the contract is unambiguous on its face. See Northwest Plaza, L.L.C. v. Michael-Glen, Inc., 102 S.W.3d 552, 557 (Mo. App. E.D. 2003); Chadwick v. Chadwick, 260 S.W.3d 421, 425 (Mo. App. S.D. 2008) (quoting Nat'l Merchandising Corp. v. McAlpin, 440 S.W.2d 489, 494 (Mo. App. Spfld. 1969)). Therefore, this Court must address the threshold question of whether the plain language of the Lease, together with the Settlement, unambiguously required CWS to give notice to Landlords of its intent to renew the Lease for the "Third Renewal Term." We find no ambiguity, and affirm.

If no ambiguity exists, we interpret a lease like any contract, according to the plain and ordinary meaning of its language. Campus Lodge of Columbia, Ltd., 319 S.W.3d at 552. However if the terms of the agreement are ambiguous, then the court may refer to parol evidence, or evidence beyond the four corners of the document itself, to interpret the contract. See Erwin v. City of Palmyra, 119 S.W.3d 582, 585 (Mo. App. E.D. 2003).

Here, the parties agree that the Lease unambiguously states that CWS may rent the leased premises for a term of five years, and it has "the option to renew . . ." the Lease for several additional five-year terms, provided it timely notifies Landlords. The parties also agree that CWS did not provide Landlords with timely written notice of its intent to renew the Lease for the

6

"Third Renewal Term." Furthermore, CWS did not increase its rental payments from $811 to $892 per month, pursuant to the rental rate under the "Third Renewal Term."

The dispute in this case arises over whether CWS remained obligated to notify Landlords of its intent to renew to extend the term of the Lease, or whether, as CWS contends, the later drafted Settlement modified or "superseded" the notice provisions in the Lease. In support, CWS points to paragraph three in the Settlement, which reads in its entirety:

> [CWS] will continue to pay rent to [Landlords] until such time [CWS is] notified that [Landlords] have entered into a contract with a third party to develop the carwash tract with [Landlords]' surrounding ground south of Jason Drive and west of Turnbull Trail. At such time [Landlords] will pay to [CWS] the sum of $200,000.00 and [CWS] will remove their fixtures, both within 60 days.

CWS argues that the above paragraph modified the Lease by permitting CWS to lease the premises indefinitely until Landlords could find a developer and pay CWS "the remaining $200,000 in damages" owed in settlement of the prior lawsuit. In essence, CWS urges this Court to find that paragraph three of the Settlement nullifies the five-year lease term and renewal option, because it states that CWS will "continue to pay rent" until Landlords enter into a contract to develop the property. CWS also argues the Settlement evidences that the parties intended Landlords be required to pay CWS $200,000 at the end of the Lease term.[4]

Landlords respond that CWS misconstrues the plain language of the Settlement and improperly relies on parol evidence to support its argument. Landlords argue that paragraph three of the Settlement is not so specific as to modify or supersede the provisions in the Lease requiring CWS to give notice of its intent to renew. Landlords observe that paragraph three does not state the renewal option should be disregarded or voided, it does not state the term of the

---

[4] CWS does not argue in its brief, as it did at the trial level, that we may alternatively find that the Settlement provided Landlords with written notice that CWS intended to renew the Lease. We, therefore, consider this alternative argument abandoned. See State ex rel. Lake of the Ozarks Cmty. Coll. Comm., Inc. v. Coordinating Bd. for Higher Educ., 802 S.W.2d 533, 534 (Mo. App. W.D. 1991).

Lease will continue indefinitely, and it does not address or alter the amount of rent to be paid. Landlords also point to paragraph four in the Settlement, which provides the parties "will continue to pay rent and the parties will perform according to the lease and any assignment or amendments thereto." This language, Landlords argue, evidences the parties' intent that CWS would continue its leasehold according to the terms of the Lease, including CWS's duty to notify Landlords if it wished to renew the term of the Lease. We agree with Landlords.

As with any contract, in interpreting the language of a lease agreement, we seek to ascertain the intent of the parties and give effect to that intent. See Dunn Indus. Group, Inc. v. City of Sugar Creek, 112 S.W.3d 421, 428 (Mo. banc 2003). In determining the intent of the parties, we begin our analysis by looking solely to the language of the contract, giving terms their plain, ordinary, and usual meaning. TAP Pharmaceutical Products Inc. v. State Bd. of Pharmacy, 238 S.W.3d 140, 143 (Mo. banc 2007); Monsanto Co. v. Syngenta Seeds, Inc., 226 S.W.3d 227, 231 (Mo. App. E.D. 2007). "[W]e review the terms of the contract as a whole, not in isolation." Tuttle v. Muenks, 21 S.W.3d 6, 11 (Mo. App. W.D. 2000). In addition we construe each term to avoid rendering other terms meaningless. Id.

"Seeming contradictions must be harmonized away if possible, and the court's interpretation should not reach an absurd or unreasonable result." Sonoma Mgmt. Co. v. Boessen, 70 S.W.3d 475, 481 (Mo. App. W.D. 2002). If inconsistent or contradictory language in the contract cannot be harmonized, then an ambiguity arises, and the trier of fact must consider extrinsic evidence to determine the parties' intent. See Edgewater Health Care, Inc. v. Health Sys. Mgmt., Inc., 752 S.W.2d 860, 865 (Mo. App. E.D. 1988); Halls Ferry Invs., Inc. v. Smith, 985 S.W.2d 848, 852 (Mo. App. E.D. 1998).

Whether a contract is ambiguous is a question of law for the court. Northwest Plaza, L.L.C., 102 S.W.3d at 557. "A contract is ambiguous only if its terms are susceptible of more than one meaning so that reasonable persons may fairly and honestly differ in their construction of the terms." Northwest Plaza, L.L.C., 102 S.W.3d at 557 (quoting Jake C. Byers, Inc. v. J.B.C. Invs., 834 S.W.2d 806, 816 (Mo. App. E.D. 1992)). Stated another way, ambiguity exists when there is "duplicity, indistinctness, or uncertainty in the meaning of the words used." Northwest Plaza, L.L.C., 102 S.W.3d at 557 (quoting Alack v. Vic Tanny Int'l of Mo., Inc., 923 S.W.2d 330, 337 (Mo. banc 1996)).

An ambiguity does not exist merely because the parties dispute the meaning of the contract. Central City Ltd. P'ship v. United Postal Sav. Ass'n, 903 S.W.2d 179, 182 (Mo. App. E.D. 1995). The ambiguity must appear from the four corners of the contract—extrinsic evidence cannot be used to create an ambiguity where none exists under the language of the agreement itself. Erwin v. City of Palmyra, 119 S.W.3d 582, 585 (Mo. App. E.D. 2003); see Dunn Indus. Group, Inc. v. City of Sugar Creek, 112 S.W.3d 421, 434 (Mo. banc 2003).

As Landlords argue, it is reasonably possible to harmonize the Settlement's paragraph three with the Lease's five-year term and renewal options. The Settlement's paragraph three plainly modifies the Lease by giving Landlords a right to early-terminate the Lease, when they "enter[] into a contract with a third party to develop the carwash tract . . . ." Furthermore, paragraphs three and four state that, until notified of Landlords' early termination, CWS must "*continue* to pay rent . . . ." Paragraph four goes on to state that aside from these provisions, "the parties will *perform* according to . . ." the Lease. (emphasis added).

The relevant terms in the Settlement's paragraphs three and four are not specifically defined. We, therefore, apply the ordinary meaning of the words, referencing the dictionary for

guidance. See Christian v. Progressive Cas. Ins., Co., 57 S.W.3d 400, 404 (Mo. App. S.D. 2001) (applying dictionary definition to define term left undefined in contractual agreement). Merriam Webster's Collegiate Dictionary, 270 (11th Ed. 2012), defines "continue" as "to maintain without interruption a condition, course, or action." "Perform" is defined, in relevant part, as "to adhere to the terms of." Id. at 920. We do not construe this language as amending the five-year term of the Lease, or CWS's obligation to notify Landlords of its intent to renew the Lease. Rather, paragraphs three and four of the Settlement provide Landlords with a newly created right to early-terminate the Lease if they should enter into a contract to develop the premises. However "until such time," CWS must pay rent to Landlords without interruption and adhere to the terms of the contract. CWS, therefore, remained obligated to notify Landlords if it intended to renew the Lease, which it did not do.

We find support for this conclusion in Sonoma Mgmt. Co. v. Boessen, 70 S.W.3d 475 (Mo. App. W.D. 2002). In Sonoma, a similar dispute arose between a landlord and tenant concerning whether the tenant had retained a renewal option to extend a commercial lease after the parties modified the original lease. Id. at 477-78. The landlord and tenant originally entered into a lease that contained a renewal option for the tenant. Id. Subsequently, the parties signed a Memorandum of Agreement that modified the lease term and the rental amount, but which otherwise stated that all of the terms of the original lease would remain unchanged. Id. at 477. At the end of the modified lease term, a dispute arose when the tenant attempted to exercise its option to renew the lease term. Id. at 478. The landlord refused to grant the renewal option, arguing the option had not been retained when the parties modified the original terms of the lease. Id. The appellate court in Sonoma rejected landlord's argument and held that because the Memorandum specifically modified only the lease term and rental payments it did not amend the

10

extension options, which remained in effect. Id. at 481. As a result, the tenant in Sonoma was entitled to renew the lease according to the original lease's renewal option. Id. Similarly, here, because paragraph three of the Settlement does not expressly or specifically modify the renewal option set forth in the Lease, and paragraph four states CWS will continue to perform according to the Lease, CWS remained obligated to provide notice to Landlords of its intent to renew the Lease. See id. (holding unless expressly amended, later modification to lease's term and rental amount does not supersede or modify the earlier lease's renewal option).[5]

Despite the unambiguous language of the Lease and the Settlement, CWS argues that the trial court should have considered affidavits and other extrinsic evidence to construe the parties' intent differently.[6] Under the parol evidence rule, "complete and unambiguous written contracts cannot generally be varied, added to or contradicted by extrinsic evidence," except in cases involving fraud, accident, mistake, duress, or mental incapacity. JCBC, L.L.C. v. Rollstock, Inc., 22 S.W.3d 197, 204-05 (Mo. App. W.D. 2000) (quoting J.R. Waymire Co. v. Antares Corp., 975 S.W.2d 243, 247 (Mo. App. W.D. 1998)). CWS does not argue that it agreed to the terms in the Lease or the Settlement as a result of fraud, accident, duress, mistake, or mental incapacity.

---

[5] CWS's interpretation would require this Court to infer that the parties intended to nullify the provisions in the Lease creating a five-year lease term and providing CWS with a renewal option if it wished to extend the Lease. In construing the intent of the parties, this Court presumes that they did not intend to create a nullity. See Tuttle, 21 S.W.3d at 12 (quoting Jones v. Cox, 629 S.W.2d 511, 513 (Mo. App. S.D. 1981)). Here, because the language in paragraph three neither expressly nullifies the five-year lease term nor CWS's option to renew the Lease our rules of construction preclude us from concluding they intended to nullify these provisions. Furthermore, CWS's interpretation would result in CWS possessing a potentially indefinite leasehold; an absurd result. See Magee v. Mercantile-Commerce Bank & Trust Co., 124 S.W.2d 1121, 1124 (Mo. 1938) ("Options which fix no time have been held void either for indefiniteness or as perpetuities."); see also Sylvester Watts Smyth Realty Co. v. Am. Sur. Co. of N.Y., 238 S.W. 494, 499 (1921) (suggesting an indefinite right of reversion in a lease may be deemed unlawful and result in voiding a lease).

[6] It argues such evidence would show that the parties intended: (1) the five-year Lease term to be superseded by a tenancy that would continue until Landlords developed the property, and (2) Landlords would unconditionally pay CWS $200,000, at the end of the Lease term.

11

Consequently, because there is no ambiguity in the language of the Lease and Settlement, the court did not err by declining to consider parol evidence to determine the parties' intent.[7]

In sum, the Settlement did not alter or supersede the Lease's five-year term, nor did it amend or modify CWS's obligation to notify Landlords of its intent to renew the Lease, which CWS failed to do.[8] Because CWS failed to provide notice of its intent to renew, the Lease term ended in December 2012.[9] Accordingly, the trial court did not err in interpreting the Lease according to its plain language. Points one and two are denied.

In its third point, CWS challenges the court's construction of the language of the Settlement. CWS argues the court's erroneous interpretation required CWS to forfeit a $200,000 settlement payment owed by Landlords.[10] In support, CWS points to extrinsic evidence and argues that the evidence in the summary judgment record "fails to establish . . . that the contracting parties . . . understood or intended that CWS was still subject to the lease renewal option, or that CWS would forfeit the settlement money by not exercising this option." We disagree.

---

[7] CWS also argues that the trial court erred, because it failed to construe the Settlement terms against Landlords, since they drafted the Settlement. The terms of a contract, however, are only construed against the drafting party when those terms are ambiguous. See Disabled Veterans Trust v. Porterfield Const., Inc., 996 S.W.2d 548, 552 (Mo. App. W.D. 1999). Again, here, we have found the language to be unambiguous. Therefore, we will construe such language according to its plain and ordinary meaning, rather than against the drafting party. On its face, the Settlement and the Lease required that CWS would continue to pay rent to Landlords according to the terms of the Lease, including the renewal options.

[8] In its reply brief CWS asserts for the first time that the Settlement terms together with the Lease do not constitute an integrated agreement. That is, CWS contends that the trial court should have considered parol evidence to determine that the parties did not intend for the Settlement to be integrated into the Lease to modify the Lease's terms. "The sole purpose of a reply brief is to rebut arguments made by respondents in their briefs, not to raise new points on appeal." Williams v. Fin. Plaza, Inc., 78 S.W.3d 175, 181-82 (Mo. App. W.D. 2002). We therefore decline to address this assertion.

[9] This determination is buttressed by the record, showing that when the December 2012 lease term ended, CWS remained in possession, and continued to pay rent to Landlords at the same rate as previously paid during the "Second Renewal Term," and Landlords initially consented to these payments. See Brittany Sobery Family Ltd. P'ship v. Coinmach Corp., 392 S.W.3d 46, 49 (Mo. App. E.D. 2013) ("Generally, when a tenant holds over with the landlord's consent, a new tenancy arises and the law presumes that the holding-over is subject to the terms and conditions of the expired lease, unless the contrary be shown.").

[10] CWS argues this interpretation runs contrary to Missouri case law which supports a policy that courts should not "aid the forfeiture of a right once established," citing to, inter alia, Francis v. Supreme Lodge A.O.U.W., 150 Mo. App. 347, 356 (1910).

Again, because the language in the Settlement is unambiguous, we will not consider extrinsic evidence to create an ambiguity. See Erwin, 119 S.W.3d at 585. Here, CWS's argument is based on the presumption that it was unconditionally entitled to the payment of $200,000, as a matter of right. However, no language in either the Settlement or the Lease indicates that the parties intended that CWS would be paid the $200,000 unconditionally. As discussed above under Points I and II, the Settlement unambiguously states CWS would be entitled to a payment of $200,000 only if Landlords exercised their right to early-terminate the Lease, which did not occur.[11] Accordingly, the court's interpretation of the Lease and Settlement did not result in forfeiture. Point three is denied.

## CONCLUSION

For the foregoing reasons, the court's grant of summary judgment is affirmed.

_____
Lisa S. Van Amburg, Judge

Lawrence E. Mooney, P. J. and
Clifford H. Ahrens, J. concur.

---

[11] Aside from paragraph three, CWS points to paragraph seven of the Settlement. Paragraph seven specifies only that, "[u]pon closing and payment of the final $200,000, taxes on the property would be prorated as of the date of that payment." This language does not evidence an unconditional right to such payment, nor does it create an ambiguity.